Catherine Cabalo (SBN 248198)
Khushpreet Mehton (SBN 276827)
PEIFFER WOLF CARR KANE
CONWAY & WISE, LLP
555 Montgomery Street, Suite 820
San Francisco, CA 94111
Tel:   (415) 766-3592
Fax:   (415) 402-0058
Email: ccabalo@peifferwolf.com
          kmehton@peifferwolf.com

*[additional counsel listed on signature page]*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHONY ROBERT PHOENIX, and ADRIENNE GENE VINCENT-PHOENIX, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>vs.<br><br>TOYOTA ARENA LLC, a California limited liability company, CITY OF ONTARIO, and Does 1-10, *et al.*,<br><br>        Defendants. | Case No.:<br><br>Civil Rights<br><br>CLASS ACTION<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES**<br><br>1. Violation of Title III of the Americans with Disabilities Act of 1990 (42 U.S.C. §§ 12101 *et seq.*)<br>2. Violation of Title II of the Americans with Disabilities Act of 1990 (42 U.S.C. §§ 12101 *et seq.*)<br>3. Violation of Title V of the Americans with Disabilities Act of 1990 (42 U.S.C. § 12203 *et seq.*)<br>4. Violation of California's Unruh Civil Rights Act (Cal. Civil Code § 51 *et seq.*)<br>5. Violation of California's Disabled Persons Act (Cal. Civil Code § 54 *et seq.*)<br><br>**DEMAND FOR JURY TRIAL** |

## I.   INTRODUCTION

1.     This is a civil rights action involving the lack of access for individuals with mobility disabilities to the building, structure, facility, complex, property, land, development, and/or surrounding business complex known as "Toyota Arena," located at or about: 4000 Ontario Center, Ontario, CA 91764 (hereinafter, "the Arena").

2.     Plaintiff Anthony Robert Phoenix uses a wheelchair for mobility. Mr. Phoenix and his wife, Plaintiff Adrienne Gene Vincent-Phoenix (together "Plaintiffs") have attempted to enjoy several events at the Arena with their family. However, they have been unable to do so because of policy and architectural barriers that prevent Plaintiffs from accessing the Arena and enjoying events there.

3.     Defendants' physical configuration of the Arena and its related facilities, and their seating and/or ticketing policies, deny full and equal access to individuals with mobility disabilities and to their companions, in violation of Titles II and III of the Americans with Disabilities Act of 1990, as well as California's Unruh Civil Rights Act. As a result, Plaintiffs have been continuously denied full and equal access and/or deterred from visiting the Arena during the three years preceding the filing of this Complaint, have been embarrassed and humiliated, and suffered damages. Plaintiffs seek damages and injunctive relief requiring provision of access under the Americans with Disabilities Act of 1990 ("ADA") and injunctive relief for full and equal access and statutory damages under California law.  Plaintiffs also seek recovery of reasonable attorneys' fees, litigation expenses and costs under federal and state law.

## II.   JURISDICTION AND VENUE

4.      This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 for violations of the ADA, 42 U.S.C. §§ 12101 *et seq.*  Pursuant to supplemental jurisdiction, attendant and related claims arising from the same facts are also brought under the Unruh Civil Rights Act, California Civil Code §§ 51, 52.

5.     Venue is proper in this court pursuant to 28 U.S.C. § 1391(b) and is founded

on the fact that the real property which is the subject of this action is located in this District and that Plaintiffs' causes of action arose in this District.

### III.   PARTIES

6.      At all times relevant to this Complaint, Plaintiff Anthony Robert Phoenix is a qualified "person with a disability" within the meaning of the ADA and the Unruh Civil Rights Act. Mr. Phoenix suffers from a neurological disorder and bone disorder which substantially limit his ability to walk or stand. Mr. Phoenix requires use of a motorized wheelchair for mobility. Mr. Phoenix also possesses a disabled parking placard and/or license plate issued by the State of California, entitling him to park in designated accessible and van-accessible parking spaces.

7.      Mr. Phoenix's wife, Ms. Vincent-Phoenix, who does not have a disability, assisted Mr. Phoenix with and accompanied him to all the events described in this Complaint. The Arena and the events at the Arena described in this Complaint must be accessible to Mr. Phoenix if Ms. Vincent-Phoenix herself is to have access to the Arena and to be able to enjoy events at the Arena.

8.      Defendant Toyota Arena LLC is a limited liability company that is headquartered in Ontario, California, and has its principal place of business in California. It owns and/or operates the Arena.

9.      Defendant City of Ontario ("City") is a municipality located in California. It is the owner, operator, lessor, and/or lessee of the businesses, properties, facilities, and/or portions of the Arena.

10.     The true names or capacities, whether individual, corporate, associate, or otherwise, of defendants Does 1-10 are unknown to Plaintiffs, who therefore sue said Doe defendants by such fictitious names. Plaintiffs are informed and believe, and thereon allege, that each of the fictitiously named defendants is in some manner legally responsible for the events and happenings herein referred to, which caused injury and damages to Plaintiffs as herein alleged. Plaintiffs pray leave of Court to amend this

Complaint to show such true names and capacities when the same have been ascertained.

11.    Plaintiffs are informed and believe, and on such information allege, that at all times mentioned here, Defendants, and each of them, were the agents, servants, employees, and representatives of each of the other Defendants, and performed all acts and omissions stated here within the scope of such agency or employment or representative capacity, and/or as part of a joint venture and common enterprise with one or more of the other Defendants, and are responsible in some manner for the acts and omissions of the other Defendants in proximately causing the damages complained of here.  All actions alleged herein were done with the knowledge, consent, approval and ratification of each of the Defendants here, including their managing agents, owners, and representatives.

## IV.    <u>FACTUAL ALLEGATIONS</u>

12.    The Arena and its facilities, including but not limited to its seating, parking facilities, paths of travel, and ticketing procedures, are each a "public accommodation" and part of a "business establishment," subject to the requirements of multiple categories of § 301(7) of the ADA (42 U.S.C. § 12181(7)), and of California Civil Code §§ 51 *et seq*.

13.    Defendants have discriminated against Plaintiffs by violating the new construction requirements of the ADA and the Unruh Civil Rights Act ("Unruh Act"). On information and belief, construction of the Arena began on or about March 7, 2007. The Arena was opened to the public on or about October 18, 2008. Such facilities constructed or altered since 1982 are also subject to "Title 24," the California State Architect's Regulations, also known as the California Building Code. Thus, the Arena was required to comply with the 2001 iteration of the California Building Code and the 1990 ADA Standards for Accessible Design, whichever provided greater accessibility for persons with mobility disabilities when originally constructed. Since its construction, the Arena has undergone construction and/or "alterations, structural repairs, or

additions," subjecting each such facility to disabled access requirements per the 2010 ADA Standards for Accessible Design and the 2010 iteration of the California Building Code, Health & Safety Code sections 19953-19959 *et seq*., and, as to construction and/or alterations since January 26, 1993, to the disabled access requirements of section 12183 of the ADA.

14.    Irrespective of the alteration history, such premises are subject to the "readily achievable" barrier removal requirements of Title III of the ADA. As alleged herein, the Arena contains numerous barriers that violate applicable federal and California disability access design standards. The Arena also lacks many of the legally required architectural features that make facilities accessible to individuals with mobility disabilities. As discussed below, the Arena suffers from a lack of sufficient accessible seating; noncompliant designated "accessible" seating; inaccessible paths of travel; deficient ticketing procedures, inadequate and/or ineffective accessibility policies, procedures, practices, and training; and other physical or intangible barriers to access.

15.    Defendants have also discriminated against Plaintiffs in that the Arena's related parking facilities do not comply with the requirements of the ADA and the Unruh Act. First, these newly constructed or altered parking facilities do not comply with federal and California disability access design standards because they lack the requisite number of compliant accessible parking spaces and the designated accessible spaces themselves are noncompliant in several respects. Second, the Arena itself lacks policies, procedures, and practices to appropriately apportion and provide and maintain designated accessible parking spaces adjacent to the Arena to serve the population of persons with mobility disabilities who attend public events at the Arena. In addition, Defendants have failed to provide accessible paths of travel from the designated accessible parking areas to the accessible entrance(s) of the Arena. As a result of these barriers, Plaintiffs have been denied meaningful and equal access to Defendants' parking facilities as well as to the Arena, in violation of the ADA and the Unruh Act. As a result, Defendants have failed

and refused to provide sufficient accessible parking and accessible paths of travel from parking to/from the Arena.

16.    Defendants have engaged in a systemic policy and practice of discriminating against persons with mobility disabilities in violation of the ADA and the Unruh Act because Defendants have, among other things, (a) failed and refused to provide and maintain full and equal access to ticketing/seating services for accessible seating for persons with mobility disabilities; and (b) failed and refused to provide and maintain full and equal access to the services, privileges, benefits, and advantages at the Arena that they provide to nondisabled persons. Defendants knowingly and intentionally denied persons with mobility disabilities the full and equal enjoyment of their businesses, services, privileges, advantages, and accommodations. Defendants have engaged in this discriminatory conduct despite the fact that Defendants' services, business practices, contracts and contractual relationships could easily be brought into compliance with the ADA and the Unruh Act, and despite the fact that Defendants are and have been fully aware that their conduct and business practices were causing harm to persons with mobility disabilities including segregation and exclusion from public events.

17.    Defendants' businesses and services as operated do not comply with the ADA or the Unruh Act and discriminate against persons with mobility disabilities, in that, *inter alia*, Defendants have failed and refused to provide full and equal access to ticketing/seating services for persons with mobility disabilities at events for which Defendants provide ticketing/seating services for nondisabled persons. Defendants continue to fail and refuse to provide ticketing/seating services for accessible seating to persons with mobility disabilities at numerous events located at the Arena, including those referenced here.

18.    On information and belief, for many events, Defendants hold back accessible seating until the day of the event to be sold or exchanged on a "first come, first served" basis. This policy, which denies access to persons with mobility disabilities, permits

Defendants to "release" accessible seating that has not been purchased to individuals without mobility disabilities on the day of the event. As a result, Mr. Phoenix was forced to travel to the Arena's box office to obtain accessible seating, on the day of the event, which places disproportionate burdens on persons with mobility disabilities. Defendants have also failed and refused to provide persons with mobility disabilities with full and equal access to the same range of ticketing services and seating options as provided to nondisabled persons, including equal access to group seating and/or ticket exchanges.

19.    The above-described violations of the ADA and the Unruh Act are illustrated by the experiences of Mr. Phoenix and Ms. Vincent-Phoenix, which are set forth in the paragraphs below.

<u>Attempts to Purchase Event Tickets at the Arena</u>

20.    On September 8, 2022, the Trans-Siberian Orchestra opened a special fan club presale for tickets to its winter concert series at the Arena. Mr. Phoenix received an access code that granted him access to purchase up to six tickets to a show through a presale website. He accessed the website and selected the December 3, 2022, 3:00 p.m. concert at the Arena. Mr. Phoenix wanted to purchase five tickets: for himself, his wife Ms. Vincent-Phoenix, and their three sons. Mr. Phoenix was prepared to purchase four disabled seating tickets and a fifth general seating ticket. Mr. Phoenix and Ms. Vincent-Phoenix planned to put their youngest on their laps so they could have the entire family together. However, the special presale did not allow Mr. Phoenix to purchase a disabled accessible seat for himself and other seats for his family. Mr. Phoenix's only option was to buy two seats at a time, which would have split the family up. Frustrated by how difficult it was to buy tickets for him and his family, Mr. Phoenix did not purchase tickets at this time.

21.    On September 15, 2022, the Arena opened their presales for the Trans-Siberian Orchestra concert. Mr. Phoenix again attempted to purchase tickets right when the sales window opened, but no additional accessible seating was available at that time.

22.     Mr. Phoenix called the Arena box office for assistance. Mr. Phoenix spoke with an Arena box office employee, "Amy," who confirmed that 6 accessible seats had been made available for sale and that there was a total of 89 accessible seats when the Arena is configured for this type of event. When Mr. Phoenix asked why only 7% of accessible seats had been made available for purchase, Amy informed Mr. Phoenix that the Arena was holding the remaining seats for "day of" accommodations. She told Mr. Phoenix that he could purchase general seating tickets and if there was accessible seating available on the day of the concert, the Arena would only accommodate Mr. Phoenix and a companion in accessible seating. Mr. Phoenix's sons would be required to sit where the general seating was purchased. Amy refused to answer any more questions.

23.     Mr. Phoenix then contacted "Josh," the Arena's customer service manager and who Amy said is the person in charge of disability accommodations. Mr. Phoenix asked Josh the same questions he had asked Amy and received the same answers. When Mr. Phoenix asked Josh about close-proximity seating, he was told that it was not offered, and that Mr. Phoenix would not be accommodated. Mr. Phoenix asked if the accessible seating would be in a comparable area to the general tickets he purchased, and Josh responded that it most likely would not be a comparable area, and it would be solely at the Arena's discretion where Mr. Phoenix would be seated, with no compensation for any difference in price. When Mr. Phoenix pressed that issue, he was informed that he should be grateful that they were offering accommodations at all.

24.     Mr. Phoenix then asked what would happen if the Arena did not have accessible seating for him on the day of the event. Josh responded that Mr. Phoenix should arrive two hours early for the concert to try to secure a better chance of getting accessible seating, but in no case would he be able to have more than two accessible seats. When Mr. Phoenix asked further questions about this issue, Josh told him that if no accessible seating was available on the day of the event, that Mr. Phoenix could walk to the general admission seats. When Mr. Phoenix explained that was not an option for

him and asked again what would happen with his seat, Josh responded that in the worst case, Mr. Phoenix would not be permitted to see the concert—that because he had a general admission ticket, he technically had a "seat." Josh told Mr. Phoenix that if he chose not to use his general admission seat, that was not the Arena's problem. However, Mr. Phoenix would not be permitted to watch the concert from other areas in the Arena while remaining in his wheelchair, as he would be a safety hazard if he situated himself anywhere other than a designated accessible seating area. Although Josh did note that it would be an unlikely situation for Mr. Phoenix not to be permitted to see the concert, the only way to find out would be to arrive at the Arena on the day of the event.

<u>Experience at the December 3, 2022 Concert at the Arena:</u>

25.   On December 3, 2022, Mr. Phoenix, Ms. Vincent-Phoenix, and their family arrived at the Arena at around 12:45 p.m. for the 3:00 p.m. concert. They entered the parking queue and paid for parking.

26.   Ms. Vincent-Phoenix was driving and requested the location of the designated accessible parking from the parking cashier. The cashier referred them ahead to two employees directing traffic. Ms. Vincent-Phoenix asked these two employees the location of the designated accessible parking areas, and one of them directed her to turn right and park in a section of the general parking lot that had been marked with a movable sandwich board sign that read "ADA Parking." All spaces in the marked "ADA Parking" section were general parking, with no ADA-compliant spaces with adjacent access aisles. Ms. Vincent-Phoenix pointed to the visible designated accessible parking section on the south side of the building, and asked if they could park their van there. That section has eight marked accessible parking spaces, including one marked as van-accessible. Three of the spaces were open, including the van-accessible spot. Ms. Vincent-Phoenix was told those spaces were in the "VIP" parking section, and they could not park there. They were again directed to the general parking section with no disabled accessible stalls, which had been

1  designated as "ADA parking."

2      27.    Upon reaching the general parking section marked as "ADA parking," Ms.

3  Vincent-Phoenix spoke with another parking employee and explained they would need

4  to occupy two adjacent parking spaces to properly deploy and use their van's wheelchair

5  lift for Mr. Phoenix. This employee said that she did not think they could do that. Rather,

6  the employee suggested they park the vehicle and have Mr. Phoenix exit the vehicle

7  before another car took the space next to them. Mr. Phoenix and his wife explained again

8  that they needed to block the adjacent space so that Mr. Phoenix could safely return to

9  the vehicle after the concert. Ms. Vincent-Phoenix consulted several nearby employees

10  who again repeated that she and Mr. Phoenix could occupy one space only. At this point,

11  Ms. Vincent-Phoenix parked the van in the space indicated, and asked an employee to

12  contact a manager, which the employee did via radio. While Ms. Vincent-Phoenix and

13  their family waited for the manager to arrive, Mr. Phoenix exited the vehicle to go to the

14  Arena box office.

15      28.    "Robert" arrived and identified himself as a parking lead. Two additional

16  parking employees were with him. Ms. Vincent-Phoenix pointed to a parking space and

17  asked if she could move the van to that space and use some of the traffic cones which

18  were placed on a nearby sidewalk to block the adjacent space. Robert agreed, Ms.

19  Vincent-Phoenix moved the van, and cones were placed in the adjacent space.

20      29.    After exiting the vehicle, Mr. Phoenix preceded directly to the Arena box

21  office. There, he spoke with "Amy," the box office attendant, and requested that he

22  exchange his tickets for accessible seating. She declined, stating that he would have to

23  enter the Arena first and then enter another line where he could then exchange tickets for

24  what was available. Mr. Phoenix requested a manager, "Kim," who repeated the same

25  statement – that Mr. Phoenix would need to enter the Arena first. Mr. Phoenix explained

26  that he had been told several times that he needed to arrive at least two hours before the

27  event to exchange his tickets for an accessible seat. Kim claimed that she had no way to

28

give Mr. Phoenix tickets at the window. When Mr. Phoenix wiggled the pass-through drawer at the window that was constructed for this very purpose and pointed out that they could easily give him tickets through the drawer, Kim again refused and told Mr. Phoenix that he had to wait in line. This situation put Mr. Phoenix in the position of being forced to enter the Arena using a general admission ticket with no guarantee that he would be given an accessible seat.

30.    Mr. Phoenix and his family proceeded to the security screening area and waited inside the gates but outside the Arena for the doors to open. About 15 minutes before the opening of the doors, Mr. Phoenix and his family were approached by an Arena employee who identified himself as the Arena's "director of parking and security." This employee first asked Mr. Phoenix to come inside the Arena to speak privately with him and then stated Mr. Phoenix's family should join them.

31.    Mr. Phoenix and his family entered the Arena and paused just inside the doors, where there were at least three other members of the Arena's security department present. This director of parking and security (the "Director") stated that he remembered Mr. Phoenix from a 2021 concert at the Arena, where Mr. Phoenix and his family experienced similar problems with parking. The Director stated that he was the manager who had responded to that situation too. The Director asked if "we are going to have a problem again," and proceeded to berate Mr. Phoenix for intimidating and scaring the box office staff. Mr. Phoenix asked for specifics, which the Director could not provide. Mr. Phoenix invited the Director to review the video surveillance from the box office. The Director informed Mr. Phoenix that he was giving Mr. Phoenix a "conduct caution" for being verbally abusive to the box office staff. Mr. Phoenix again asked for specifics of what he had done, to which the Director again stated that he could not provide details. Mr. Phoenix asked how the Arena could give him a "caution" for conduct that did not occur and that the Director could not describe. The Director responded that it did not matter, that he could caution Mr. Phoenix for anything he wanted, and that Mr. Phoenix

was lucky that he didn't revoke his and his family's tickets and kick them out. Mr. Phoenix and Ms. Vincent-Phoenix believe the Director had this talk with them in retaliation for them making their best efforts to come up with workarounds for an inaccessible Arena and its discriminatory policies. At no time did Mr. Phoenix or Ms. Vincent-Phoenix "intimidate" or "scare" Arena staff other than pointing out obligations and requirements under the ADA and asking Arena employees for reasonable accommodations. To add insult to this retaliatory injury, this exchange happened in front of Plaintiffs' kids, which was humiliating and demeaning to Plaintiffs.

32.    Sometime during this exchange, Ms. Vincent-Phoenix asked the Director to repeat his name, which he provided. The Director also indicated that the entire conversation was being video recorded and made an off comment that Mr. Phoenix had "one year to sue me."

33.    Ms. Vincent-Phoenix went to the ticket window inside the Arena to exchange the tickets. Mr. Phoenix had purchased five seats in section 115, Row J, seats 1-5. These tickets were $107.50 each. The box office employee offered two options for exchanging their tickets:

    a.    Five seats in the 300 level, a third-floor terrace. The Arena seating chart did not list a price for these tickets, but the section is behind the P7 level. Tickets in the P7 sections were $37.00 each for this concert;

    b.    Two seats in a designated "accessible" area at the top of section 116, and three seats in the bottom part of section 115.

34.    The seats in the 300 level have a significantly inferior viewing angle to the seats Mr. Phoenix paid for and are significantly further from the stage. The box office cashier said the Arena would not issue a refund for the difference in ticket value. She stated that if Plaintiffs and their family wanted to sit in the sections they had paid for, they would need to break their party up. Ms. Vincent-Phoenix specifically asked if there was any accessible seating on the floor, and the box office employee said the floor seating

had no wheelchair access. Floor seating was offered at the same price as Mr. Phoenix's purchased seats.

35.    Mr. Phoenix and Ms. Vincent-Phoenix reluctantly chose to split their family into two groups and ended up sitting far from each other.

36.    The provided designated "accessible" seats at the top of section 116 were inferior seats. Mr. Phoenix had to watch the left side of the stage through a thick acrylic or glass partition that was separating a box from the general admission seats. It was incredibly distracting as lights and laser effects refracted through the partition, making a portion of the stage unviewable and at other times created a lensing effect that triggered a headache in Mr. Phoenix, as his eyes constantly refocused on the stage and the partition throughout the concert. There were show elements in the center-rear of the floor seating, but those were only viewable through the full glass/acrylic partition. This glass/acrylic partition affected the line of sight of the designated "accessible" seats and did not appear to affect the lines of sight of other non-accessible seats in the section.

37.    After being explicitly told that there was no wheelchair accessible seating on the Arena floor, Mr. Phoenix was surprised to see a man using a wheelchair being escorted to a seat on the Arena floor just moments after the concert began. A chair was removed from the end of a row to make room for this patron, and his companion occupied the adjacent seat.

38.    Mr. Phoenix and his family ran into that patron after the show and asked him how he had been able to purchase tickets for the floor, or how he had come to be seated on the floor. The patron said that his wife had won the tickets in a radio promotion but had been unable to attend the concert. He and his companion arrived at the Arena, showed their tickets, and were escorted to the Arena floor with no issue.

39.    Mr. Phoenix and Ms. Vincent-Phoenix allege continuous and ongoing discrimination. They want to—and plan to—attend future events at the Arena, and they are frustrated and anxious for Defendants to remediate the access barriers and to

provide reasonable modifications in policies, practices, and procedures, as alleged herein, so that they can participate in and enjoy events like non-disabled event-goers.

40. Plaintiffs' complaints to the Arena's employees and Defendants' representatives have been ignored. Plaintiffs allege that it would be a futile gesture to provide further notices of violations relating to Plaintiffs' continuous visits and deterrence, which are certain to occur regularly following the filing of this Complaint. Therefore, Plaintiffs will seek to supplement this Complaint at the time of trial as to subsequent events, according to proof.

41. Ms. Vincent-Phoenix seeks relief based on her association with her husband, Mr. Phoenix. She has been discriminated against and suffered an injury within the meaning of the ADA that is separate, direct, and independent from that suffered by Mr. Phoenix because of her attempts to attend events at the Arena with Mr. Phoenix. Ms. Vincent-Phoenix experienced frustration, emotional distress, and discrimination when the Arena refused Mr. Phoenix's requests for the reasonable modification in policy and practice of allowing him to purchase and/or exchange accessible seating and companion seating tickets to sit with his entire family in equivalent seating to which he had purchased. Ms. Vincent-Phoenix also experienced frustration, emotional distress, physical exhaustion, and discrimination because of the being forced to assist Mr. Phoenix to traverse and/or overcome many physical access barriers in connection with the Arena's inaccessible parking facilities, inaccessible paths of travel from those facilities to the Arena, and other inaccessible features of the Arena itself as alleged herein. These injuries are specific to her independent right to access the Arena, its ticketing, seating, its parking facilities, and its surrounding paths of travel with her husband. Ms. Vincent-Phoenix was unable to enjoy the concert with her family and was ultimately denied full and equal access to the Arena's goods, services, privileges and accommodations because of her association with a person with a mobility disability.

42. Defendants knew, or should have known, that these elements and areas of

the Arena and its supporting parking facilities and paths of travel were inaccessible, and that these barriers, Defendants' policies regarding ticketing and accessible seating, and Defendants' failure to adequately train staff in providing full and equal services and accommodations to patrons with disabilities violate state and federal law, and interfere with or deny access to individuals with mobility disabilities. To date, however, Defendants refuse to remove those barriers or to provide full and equal access to ticketing and seating services.

43.    On or about March 6, 2023, Plaintiffs served a claim on Defendant City.  On March 8, 2023, George Hills Company, Inc. ("George Hills"), the City's third-party administrator, acknowledged receipt of Plaintiffs' claims. On April 10, 2023, George Hills notified Plaintiffs' counsel via email that it was "responsible for investigation, review and where appropriate, settling claims brought by third parties against the City." The April 10, 2023 email claimed "the Toyota arena is not maintained by the City of Ontario" and that it would be recommending Plaintiffs' claims be rejected. Plaintiffs' counsel received a Notice of Rejection from George Hills dated October 30, 2023.

44.    Plaintiffs' goal in this suit is positive: to make the Arena accessible and free of architectural barriers to access with seating, ticketing procedures, and physical elements fully accessible to persons with mobility disabilities and their families and/or companions who accompany them to events at the Arena.

## V.    OTHER SPECIFIC BARRIERS

45.    In addition to the experiences and architectural barriers to access described herein, Plaintiffs consulted a Certified Access Specialist (CASp) who identified numerous barriers to safe and independent use of the Arena and its related facilities by persons with mobility disabilities.

46.    The barriers to access identified by Plaintiffs' CASp include the following:

a.    <u>Northwest Parking Lot A</u>:

- Most of the designated disabled parking areas in Lot A have changes in level which exceed the 2.08% maximum allowed in any direction at the transition from asphalt to concrete;

- Several of the designated disabled parking spaces and adjacent access aisles have extremely faded pavement markings, some of which cannot readily be viewed;

- None of the designated disabled parking spaces have posted signage mounted at the head end of the parking space (and visible when occupied); this includes no "Van Accessible" and/or "Minimum Fine $250" signage;

- There is no accessible route of travel from most of the designated disabled parking spaces because they require users to travel behind parked vehicles other than their own;

b. <u>Southside of Arena:</u>

- At the south side of the building there are eight designated accessible parking spaces with adjacent access aisles;

  - On information and belief, when these spaces are filled on a first-come, first-served basis, Arena staff directs guests to use the parking lot across the road. That lot includes a sandwich board sign that says, "ADA parking," but there are no designated disabled parking spaces with adjacent access aisles marked or with posted signage in this area. There is also no direct accessible route of travel from this parking lot to the arena side without having to traverse some portion of the road to reach the curb ramp.

c. <u>Northeast Lot F:</u>

- The accessible route of travel from the 23 designated accessible parking spaces has an excessively sloped walkway that leads up to the public right-of-way sidewalk. There is a change in level across the

bottom of the sloped walkway which is greater than one-half inch. The paving joints on the sloped walkway also have noncompliant changes in level at the joints;

- At the intersection at the northwest corner of the arena, at the entrance marked "NW entrance" adjacent to the VIP club, the curb ramps on the street opposite the Arena have excessive counter slope at the bottom;

- The crosswalk is comprised of pavers which have noncompliant changes in level at some locations created by chipped sections in the tops of some of the pavers;

- At the southeast corner of the intersection, the curb ramp has noncompliant counter slope at the bottom of the ramp. There also are noncompliant changes in level created by spalled concrete on the flared sides of the ramp;

- There is a marked crosswalk going over to the northwest entrance, but there is no curb ramp adjacent to the crosswalk; instead, the path of travel requires individuals to turn west and go up the driveway through vehicle traffic to get to the curb ramp;

- On the Arena side of the street, to get to the entrance requires traveling up an excessively sloped walkway that is east of the entrance. At the bottom of the sloped walkway there is an approximately 6-inch wide strip of concrete that extends the length of the walkway that appears to have settled and created a noncompliant change in level up to approximately 1 inch;

- On the north side of the Arena along the street, there is an approximately 156-foot long green-painted curb section marked "Ride share drop-off pick-up"; however, there is no section with a compliant width access aisle or unloading area and no curb ramps;

d. Northeast Arena Entrance Area:

- ▪ The Urban City Taqueria queue area uses retractable-belt stanchions which reduce the minimum width of travel to less than 36 inches at the front of the queue adjacent to the sales counter;
- ▪ The team merchandise sales area adjacent to the northeast entrance of the Arena does not have a lowered sales counter;

e. Section 111 Area:

- ▪ The restrooms across from sections 109 and 111 have some lavatories with sharp hose clamps below them. Several of the lavatories' water supply lines are not wrapped or insulated;

f. Section 112 Area:

- ▪ Immediately inside the southeast entrance, near section 112, there is a Michelob Ultra Club Beer stand which does not have a lowered sales counter, and the pay point devices appear to be mounted too high;
- ▪ This beer stand uses retractable-belt stanchions which reduce the required minimum width at the turns of the queue;

g. Section 115 Area:

- ▪ At the Fuel Filling Station concession stand, across from section 115, there are no accessible seating/dining surfaces;
- ▪ This stand also uses retractable-belt stanchions which reduce the required minimum width at the turns of its queue;
- ▪ Just south of the Fuel Filling Station is a grab-and-go sales area with a small snack display and refrigerator-style drink coolers; however, none of the kiosks have a compliant lowered sales counter;
- ▪ The Good Guys Bar does not have any accessible seating/dining surfaces and uses retractable-belt stanchions that reduce the required width at the turns of the queue;
- ▪ Just south and adjacent to the Good Guys Bar is a small area where there are portable concession stands stored. None of these stands have compliant height lowered sales counters. Further south of this area,

adjacent to the southeast entrance of the Arena, is a portable concession stand with no lowered complaint sales counter and/or point-of-sale device;

h. <u>Section 117 Area:</u>

- The designated accessible seating area at the top of the stairs leading down to the lower section provides inferior seating to the equivalent fixed seating (*i.e.*, no armrests like the fixed seating);
- At the south end of the Arena there is a large concession stand; however, there is no lowered section of the sales counter;

i. <u>Section 118 Area:</u>

- The men's restroom adjacent to section 118 has an improperly configured accessible stall;
  - The toilet paper dispenser is more than 36 inches from the back wall;
  - The side wall grab bar is more than 12 inches from the back wall;
- The men's restroom also has paper towel and hand sanitizer dispensers that are more than 40 inches above the finished floor;
- Several of the lavatories' water supply pipes are not properly wrapped or insulated;

j. <u>South End of Arena:</u>

- There are short square 2-foot posts in some of the designated accessible seating areas, which are not in all other seating areas;
- On the west side of this area there are no accessible seating/dining surfaces, as there are only high-top dining counters and/or drink shelves built into the columns;
- The Pizza Joint condiment station baskets are stacked higher than 48 inches, and this stand uses retractable-belt stanchions which reduce the minimum clear width and at the turns of the queue;

- ▪ Suite 1 does not provide at least 5% accessible seating surfaces;
- ▪ Suite 3 does not provide at least 5% accessible seating surfaces and does not maintain a 36-inch minimum width circulation path throughout the suite;
- ▪ The Golden Road Beer stand near section 106 does not have a lowered compliant sales counter.

## VI.   CLASS ALLEGATIONS

47.   The named Plaintiffs bring this action on behalf of themselves and all persons similarly situated. They seek class certification pursuant to Federal Rule of Civil Procedure 23(b)(2) and/or (b)(3) as set forth below.

48.   **Class Definitions.**   The three classes that Plaintiffs seek to represent are comprised of the following:

a.   *Damages Class.* The first class of persons seeks statutory damages under the Unruh Act and is defined as follows: All persons with mobility disabilities who use wheelchairs, scooters or other mobility aids who have purchased, attempted to purchase, or for whom third parties purchased accessible seating and who have been denied equal access to the Arena's facilities, services, accessible seating, parking, paths of travel, amenities, and privileges during the two  years prior to the filing of the Complaint herein through the conclusion of this action.

b.   *Disabled Patron Declaratory & Injunctive Relief Class.* The second class of persons seeks declaratory and injunctive relief and is defined as follows: All persons with mobility disabilities who use wheelchairs, scooters or other mobility aids who will attempt to purchase accessible seating for a public event at the Arena and who will be denied equal access to the Arena's facilities, services, accessible seating, parking, paths of travel, amenities, and

privileges, including ticketing, during the three years prior to the filing of the Complaint herein through the conclusion of this action.

c. *Companion Patron Declaratory & Injunctive Relief Class.* The third class of persons seeks declaratory and injunctive relief and is defined as follows: All persons who are companions of persons with mobility disabilities who use wheelchairs, scooters or other mobility aids and who have used or will use companion seating for public events located at the Arena during the three years prior to the filing of the Complaint herein through the conclusion of this action.

49. Excluded from the above-referenced class definitions are the officers, directors, and employees of Defendants, and any of Defendants' shareholders or other persons who hold a financial interest in Defendants. Also excluded is any judge assigned to hear this case (or any spouse or family member of any assigned judge), or any juror selected to hear this case.

50. This action is brought as a class action and may properly be so maintained pursuant to Federal Rule of Civil Procedure 23 and applicable case law. In addition to declaratory and injunctive relief, this action seeks classwide damages pursuant to California Civil Code § 52(a) in the amount of $4,000 per illegal incident for each class member based on Defendants' wrongful policy and practice of failing to provide full and equal access to accessible parking, paths of travel, ticketing, and/or accommodation services for accessible seating as alleged herein. This action does not seek class recovery for actual damages, personal injuries or emotional distress that may have been caused by Defendants' conduct alleged herein. The named Plaintiffs seek compensatory damages and damages for emotional distress for themselves individually.

51. **Impracticability of Joinder (Numerosity of the Class).** The members of the proposed classes are so numerous that joinder of all such persons is impracticable and the disposition of their claims in a class action is a benefit both to the parties and to

this Court.  The number of persons in this case exceeds 100 persons. The number of persons in the class and their identities and addresses may be ascertained from Defendants' records.

52.  **Questions of Fact and Law Common to the Class.** All members of the classes have been and continue to be denied their civil rights to full and equal access to, and use and enjoyment of, the services and facilities operated by Defendants because of the violations of disability nondiscrimination laws alleged herein.  There are numerous questions of law and fact common to the class, including, but not limited to, the following:

  a.  Whether Defendants are the owners, managers, operators or lessors of a public accommodation within the meaning of Title III of the ADA;

  b.  Whether the Arena and Defendants are business establishments within the meaning of the Unruh Act;

  c.  Whether Defendants constructed or altered the Arena, its related facilities, and/or parking facilities after the effective date of the ADA;

  d.  Whether the Arena, its parking, and other facilities comply with the 1991 ADA Standards for Accessible Design;

  e.  Whether the Arena, its parking, and other facilities comply with the 2010 ADA Standards for Accessible Design;

  f.  Whether the Arena, its parking, and other facilities comply with the 2010 iteration of the California Building Code as it pertains to disability access;

  g.  Whether the City's facilities, parking lots, paths of travel, sidewalks, crosswalks, curbs and curb ramps owned and operated by the City contain physical barriers that limit or deny access to the Arena by persons with mobility disabilities;

  h.  Whether Defendants City is discriminating against Plaintiffs and members of the proposed classes in violation of Title II of the ADA, 42 U.S.C. sections

12131, *et seq.*, by failing to make their facilities, programs, services and activities accessible to and usable by persons with mobility disabilities;

i. Whether Defendants provide seating services to public events held at the Arena;

j. Whether Defendants provide persons with mobility disabilities with full and equal access to their ticketing services, including the opportunity to purchase tickets for accessible seating during the same hours, methods of distribution, the same types and numbers of ticketing sales outlets (including telephone service, in-person ticket sales at a facility, and its website) as nondisabled persons as required by 28 C.F.R. § 36.302(f)(1)(ii) and 28 C.F.R § 35.138(a)(2);

k. Whether Defendants provide persons with mobility disabilities with an equal opportunity to purchase tickets for accessible seating at all price levels for events or series of events as required by 28 C.F.R. § 36.302(f)(3) and 28 C.F.R. § 35.138(c);

l. Whether Defendants permit persons with mobility disabilities with an equal opportunity to purchase group seating, including the ability to purchase the same number of total tickets as are permitted to a group of nondisabled persons as required by 28 C.F.R. § 36.302(f)(4) and 28 C.F.R. § 35.138(d)(4);

m. Whether Defendants permit persons with mobility disabilities the opportunity to purchase group seating so that the group contains accessible seating with nondisabled seating nearby so that, if possible, the entire group can sit together as required by 28 C.F.R. § 36.302(f)(4)(v); and 28 C.F.R. § 35.138(d)(5);

n.  Whether Defendants' policy and practice of failing and refusing to provide persons with mobility disabilities with full and equal access to its ticketing services violates the ADA;

o.  Whether Defendants' policy and practice of failing and refusing to provide persons with mobility disabilities with access to ticketing services through the Arena website, telephone, or in-person from the Arena's box office violates the ADA;

p.  Whether Defendants' policy and practice of failing and refusing to provide equal access to ticketing has the effect of denying persons with mobility disabilities with full and equal access to ticketing services, and full and equal access to and enjoyment of the public events offered at Defendants' venues;

q.  Whether Defendants have made reasonable modifications in their policies and practices regarding ticketing so as to ensure that persons with mobility disabilities have an equal opportunity to purchase tickets for accessible seating, and full and equal access to, and enjoyment of, Defendants' public events;

r.  Whether Defendants are violating California Civil Code § 51, *et seq.*, by failing to provide full and equal access to people with mobility disabilities;

s.  Whether Defendants, by their actions and omissions alleged herein, have engaged in a pattern and practice of discriminating against Plaintiffs and other persons with mobility disabilities in violation of applicable state and federal disability civil rights laws;

t.  Whether Plaintiffs and the members of the putative class are entitled to damages, and the nature of such damages; and,

u.  Whether Plaintiffs and the members of the putative class are entitled to declaratory and/or injunctive relief, and the nature of such relief.

53.     **Typicality.** The claims of the named Plaintiffs are typical of those of the class. Plaintiffs' claims are typical of the claims of the proposed class in the following ways: a) Plaintiffs are members of the proposed class; b) Plaintiffs' claims arise from the same physical barriers, uniform corporate policies, procedures, practices and course of conduct on the part of Defendants; c) Plaintiffs' claims are based on the same legal and remedial theories as those of the proposed class and involve similar factual circumstances; d) the injuries suffered by the named Plaintiffs are similar to the injuries suffered by the proposed class members; and e) the relief sought herein will benefit the named Plaintiffs and all class members alike. The claims of Plaintiff Mr. Phoenix are typical of those of the proposed class of persons with mobility disabilities. The claims of Plaintiff Ms. Vincent-Phoenix are typical of those of the proposed class of companions of persons with mobility disabilities.

54.     **Adequacy.** The named Plaintiffs will fairly and adequately represent the interests of their respective classes. They have no interests adverse to the interests of other members of the proposed classes and have retained counsel who are competent and experienced in litigating complex class actions, including large-scale disability rights class action cases.

55.     **Predominance.** With respect to Plaintiffs' claims under the ADA and the Unruh Act, class certification is appropriate under Federal Rule of Civil Procedure 23(b)(3) because questions of law or fact common to the class members predominate over any questions affecting only individual members of the proposed classes.

56.     **Superiority.** A class action is superior to other methods for the fair and efficient adjudication of this controversy because, inter alia: a) individual claims by the class members would be impracticable because the costs of pursuit of such claims would far exceed what any individual class member has at stake; b) relatively little individual litigation has been commenced over the controversies alleged in this Complaint and individual class members are unlikely to have an interest in separately prosecuting and

controlling individual actions; c) the concentration of litigation of these claims in one forum will achieve efficiency and promote judicial economy; d) the proposed class is manageable, and no difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action; e) the proposed class members are readily identifiable from Defendants' own records; and f) prosecution of separation actions by individual members of the proposed class would create the risk of inconsistent or varying adjudications with respect to individual members of the proposed class that would establish incompatible standards of conduct for Defendants.

57.    **The Class Meets the Requirements of Federal Rule of Civil Procedure 23(b)(2).** Defendants have acted and refused to act on grounds generally applicable to the class, making the declaratory and injunctive relief sought on behalf of the class as a whole appropriate.

58.    Without a class action, Defendants will likely retain the benefit of their wrongdoing and will continue in their illegal course of conduct which will result in further damages and injuries to the Plaintiffs and the proposed classes.

**FIRST CLAIM:**
**VIOLATION OF THE ADA, TITLE III**
**[42 U.S.C. §§ 12101, *et seq.*]**
**(Against Toyota Arena LLC and Does 1-5)**

59.    Plaintiffs replead and incorporate by reference, as if fully set forth again herein, the allegations contained in all paragraphs of this Complaint, and incorporate them herein as if separately repled.

60.    Mr. Phoenix is and was at all times relevant herein a qualified individual with a disability for all purposes under the ADA.

61.    Mr. Phoenix has reasonable grounds for believing he will be subjected to discrimination each time he may attempt to use the subject property and premises, considering Defendants' policies and physical premises barriers.

62.     Plaintiffs would like to return to the Arena in the future but are deterred from attempting to return because of the Arena's inaccessibility and retaliation they endured the last time they were at the Arena.

63.     The subject property and facility operated by Defendants is one of the "private entities" which are considered "public accommodations" for purposes of Title III of the ADA, which includes any "a motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment," 42 U.S.C. § 12181(7)(C), and any "restaurant, bar, or other establishment serving food or drink," 42 U.S.C. § 12181(7)(B).

64.     The acts and omissions of Defendants set forth herein were in violation of Plaintiffs' rights under the ADA and the regulations promulgated thereunder, 28 C.F.R. Part 36, *et seq*.

65.     The removal of each of the physical and policy barriers complained of by Plaintiffs as hereinabove alleged, were at all times herein mentioned "readily achievable" under the standards of 42 U.S.C. sections 12181 and 12182 of the ADA. As noted throughout this Complaint, removal of each and every one of the architectural and/or policy barriers complained of herein was already required under California law.

66.     The Arena was designed and constructed after January 26, 1993, thus triggering access requirements under Title III of the ADA. The ADA prohibits designing and constructing facilities for first occupancy after January 26, 1993 that are not readily accessible to, and usable by, individuals with disabilities when it was structurally practicable to do so. 42 U.S.C. § 12183(a)(1). Here, Defendants violated the ADA by designing and constructing the Arena in a manner that did not comply with federal disability access design standards even though it was structurally practicable to do so.

67.     Similarly, any alterations, structural repairs, or additions since January 26,

1993 have independently triggered requirements for removal of barriers to access for disabled persons per 42 U.S.C. section 12183 of the ADA.

68.   Defendants have discriminated against Plaintiffs in violation of Title III of the ADA by: (a) providing benefits that are unequal to that afforded to people without disabilities by not providing an accessible guest room and other accessible features; (b) failing to make reasonable modifications in policies, practices, or procedures (at the Arena itself and for ticketing services for events at the Arena) when such modifications are necessary to afford, and would not fundamentally alter the nature of, the goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities; (c) failing to take steps as may be necessary to ensure that no individual with a disability is excluded, denied service, segregated, or otherwise treated differently than other individuals because of the absence of auxiliary aids and services; (d) failing to remove architectural barriers that are structural in nature in existing facilities where such removal is readily achievable; and (e) where Defendants can demonstrate the removal of architectural barriers is not readily achievable, failing to make the goods, services, facilities, privileges, advantages, or accommodations available through alternative methods if such methods are readily achievable.

69.   As of the date of Plaintiff's encounters at the premises and as of the filing of this Complaint, Defendants' actions, policies, and physical premises have denied and continue to deny full and equal access to Mr. Phoenix and to other mobility disabled persons in numerous other respects, which violate Mr. Phoenix's right to full and equal access and which discriminate against Mr. Phoenix on the basis of his disabilities and, thus wrongfully deny Mr. Phoenix and his wife Ms. Vincent-Phoenix the full and equal enjoyment of the goods, services, facilities, privileges, advantages and accommodations at the Arena, in violation of 42 U.S.C. sections 12182 and 12183 of the ADA.

70.   Defendants' actions also continue to deny Plaintiffs' rights to full and equal access by deterring Plaintiffs from patronizing the Arena.

71.     Plaintiff Ms. Vincent-Phoenix seeks relief based on her association with Mr. Phoenix. She has been discriminated against and suffered injury within the meaning of the ADA because the ADA violations described in this Complaint forced her to assist Mr. Phoenix with obtaining equivalent accessible seating for their family and assist Mr. Phoenix with traversing and/or overcoming physical access barriers in connection with the Arena's inaccessible parking facilities; inaccessible paths of travel from those facilities to the Arena; noncompliant designated "accessible" seating; discriminatory policies, procedures, and practices; and other inaccessible features as alleged herein. As a result, Ms. Vincent-Phoenix suffered a separate and distinct injury because she was unable to enjoy the concert at the Arena with her family.

## SECOND CLAIM:
## VIOLATION OF THE ADA, TITLE II
### [42 U.S.C. §§ 12201, *et seq.*]
### (Against the City and Does 6-10)

72.     Plaintiffs replead and incorporate by reference, as if fully set forth hereafter, the allegations contained in all paragraphs of this Complaint and incorporate them herein as if separately repled.

73.     Effective January 26, 1992, Mr. Phoenix was entitled to the protections of the "Public Services" provision of Title II of the Americans with Disabilities Act of 1990. Title II, Subpart A prohibits discrimination by any "public entity", including any state or local government, as defined by 42 U.S.C. § 12131.

74.     Under Title II of the ADA, 42 U.S.C. § 12132, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity.

75.     Plaintiff Mr. Phoenix was at all times relevant herein a qualified individual with a disability as defined by the ADA.

76. Defendants City and Does 15-30 were at all relevant times a "public entity" covered by Title II of the ADA and its accompanying regulations.

77. The Arena that is owned, operated, or administered by Defendant City includes buildings, structures, pedestrian rights of way and other facilities within the meaning of the 1991 ADA Standards for Accessible Design. Plaintiffs are informed and believe, and on that basis allege, that since January 26, 1993, Defendant City has constructed, altered, and/or repaired parts of these premises within the meaning of the 1991 ADA Standards for Accessible Design or the 2010 ADA Standards for Accessible Design, and that Defendants have failed to make their facilities readily accessible to and usable by persons with mobility disabilities as required under federal accessibility standards.

78. Public entity defendants City and Does 15-30 have failed to provide meaningful and equal access to the benefits of their services, programs and activities to persons with mobility disabilities as described herein, including without limitation, failing to: (a) ensure that the Arena and other public facilities located on the property owned and operated by defendant City are readily accessible to and usable by disabled persons; (b) ensure that related public facilities and public accommodations, as described herein, including without limitation, the Arena's related parking programs and facilities, and the paths of travel and pedestrian rights of way leading from those parking lots to the Arena entrances, are readily accessible to and usable by persons with mobility disabilities; (c) comply with requirements and standards in effect at the time of alterations or construction of the Arena; (d) implement and maintain policies at the Arena and its ticketing box office to ensure that events at the Arena are accessible to and usable by mobility disabled persons; (e ) remove known architectural barriers at the Arena and other public facilities located on the subject property so as to be accessible to and usable by disabled persons; and/or (f) modify their programs, services, and activities to make them readily accessible to and usable by disabled persons, including Mr. Phoenix. As a

proximate result of defendants City's and Does 15-20's actions and omissions, Plaintiffs were discriminated against in violation of Title II of the ADA and of the regulations adopted to implement the ADA.

79.    Plaintiffs suffered damages, compensable under Title II for intentional acts of the City and Doe Defendants, including deliberate indifference, and have suffered physical, mental and emotional damages, including difficulty, discomfort, or embarrassment.

80.    To the date of filing this Complaint, the Arena and its ticketing policies continue to be inaccessible for safe and independent use by persons with mobility disabilities such as Mr. Phoenix. Mr. Phoenix is unable, so long as such acts and omissions of Defendant City continue, to achieve equal access to and use of the Arena and its ticketing policies, and cannot return to properly use them until they are made readily accessible to persons with mobility disabilities, as required by Title II and its implementing regulations. Mr. Phoenix alleges that he intends to return to the Arena once legally required access has been provided. The acts of Defendant City have proximately caused and will continue to cause irreparable injury to Mr. Phoenix if not enjoined by this Court.

81.    Plaintiff Ms. Vincent-Phoenix seeks relief pursuant to remedies set forth in 42 U.S.C. § 12203. She has been discriminated against in her attempts to assist Mr. Phoenix with obtaining accommodations for accessible seating and companion seating for public events at the Arena. In addition, she has herself experienced discrimination as a result of struggling to assist Mr. Phoenix with access barriers that limit or deny access to Defendants' programs, services, activities and facilities, including, but not limited to: the Arena's lack of sufficient accessible and available designated disabled parking areas; lack of accessible paths of travel; lack of adequate accessible and companion seating comparable to regular seating; deficient ADA training for its employees; and policies, procedures, and practices that fail to provide full and equal access to the Arena generally.

82.     Per § 12133 of the ADA, as a result of such discrimination in violation of § 12132 of the ADA, Plaintiffs are entitled to the remedies, procedures and rights set forth in Section 505 of the Rehabilitation Act of 1973 (29 U.S.C. § 794a).

## THIRD CLAIM:
## VIOLATION OF THE ADA, TITLE V – ANTI-RETALIATION PROVISION
## [42 U.S.C. § 12203]
## (Against All Defendants)

80.     Plaintiffs replead and incorporate by reference, as if fully set forth again herein, the factual allegations contained in all paragraphs of this Complaint, and incorporate them herein by reference as if separately repled hereafter.

81.     The ADA prohibits retaliation of an individual because that individual opposes any act made unlawful by the ADA. 42 U.S.C. § 12203(a).

82.     The ADA prohibits the interference of an individual's exercise of their rights under the ADA. 42 U.S.C. § 12203 (b). Through the acts described above, Mr. Phoenix and Ms. Vincent-Phoenix engaged in protected to activity by requesting full and equal access to the Arena as required by the Americans with Disabilities Act, including, but not limited to, requesting reasonable accommodations and accessible seating.

83.     On December 3, 2023, Defendants took an adverse action by refusing to discuss reasonable accommodations with Plaintiffs and instead had Defendants' Director berate Plaintiffs in front of their children, falsely accusing Mr. Phoenix of scaring the box office staff, threatening to evict Plaintiffs from the Arena, giving Plaintiffs a baseless "conduct caution," and daring Plaintiffs to sue the Director, all because of Plaintiffs' attempts to find workarounds to allow Mr. Phoenix to physically access the Arena and to alert Defendants and their employees of the many barriers to access the Arena.

## FOURTH CLAIM:

## VIOLATION OF THE UNRUH CIVIL RIGHTS ACT
### [Cal. Civil Code §§ 51, *et seq.*]
### (Against All Defendants)

84.     Plaintiffs replead and incorporate by reference, as if fully set forth again herein, the factual allegations contained in all paragraphs of this Complaint, and incorporate them herein by reference as if separately repled hereafter.

85.     The Unruh Act, California Civil Code 51(b), provides that:

All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, or medical condition are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.

86.     Defendants are business establishments within the meaning of the Unruh Act. Defendants are the owners and operators of business establishments related to the Arena.

87.     Defendants violated the Unruh Act by their acts and omissions, as follows:

   a.  Failing to provide accessible facilities and the Arena for Mr. Phoenix and others with similar mobility disabilities.

   b.  Failing to construct and/or alter the Arena in compliance with state building code and state architectural requirements;

   c.  Failing to modify their policies and procedures as necessary to ensure Plaintiffs full and equal access to their accommodations, advantages, facilities, privileges, or services at the Arena, and ticketing for accessible seating at the Arena; and

   d.  Violating the ADA, a violation of which is a violation of the Unruh Act. Cal. Civil Code § 51(f).

88.     Plaintiffs have experienced numerous barriers to access at the Arena, its

related parking facilities and the pedestrian right of way leading from those facilities to the Arena, its ticketing services for events at the Arena, as well as the Arena's general policies and procedures, all of which have caused them major difficulty, discomfort, and embarrassment. The named Plaintiffs suffered physical, mental and emotional damages, including statutory and compensatory damages, according to proof.

89.    The Arena and its premises are also illegally inaccessible in multiple other respects. The barriers to access described in this Complaint are listed without prejudice to Plaintiffs citing additional barriers to access after inspection by Plaintiffs' access expert(s), per the Ninth Circuit's standing standards under *Doran v. 7-Eleven, Inc.*, 524 F.3d 1034 (9th Cir. 2008) and *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939 (9th Cir. 2011) (en banc). Plaintiffs pray for leave to amend this Complaint following a noticed inspection by their CASp to obtain full injunctive relief as to those barriers that limit or deny full and equal access to persons with mobility disabilities.

90.    Further, each violation of the ADA (as pled in the First and Second Claims, *supra*), also constitutes a separate and distinct violation of California Civil Code § 51(f), thus independently justifying an award of damages and injunctive relief pursuant to California law, including, but not limited to, Civil Code § 52(a).

91.    With respect to Defendants' violations of the Unruh Act that are not predicated on violations of the ADA, Defendants' behavior was intentional: they were aware of and/or were made aware of their duties to refrain from establishing or creating discriminatory policies and barriers that prevent persons with mobility disabilities from obtaining full and equal access to their programs and facilities. For example, Defendants were aware of their obligations to provide accessible features as required by the California Building Code (CBC), but willfully failed to construct the Arena in compliance with the CBC. Defendants did so with full knowledge that their failure to comply with the CBC would result in the denial of full and equal access to persons with mobility disabilities, thus denying them their civil rights and discriminating against them in violation of the

Unruh Act.

92.     Defendants have continued their illegal and discriminatory policies and practices at the Arena and in their ticketing procedures for the Arena despite actual knowledge that people with mobility disabilities encounter physical barriers and policies and practices that limit or deny them full and equal access to the Arena. Although Plaintiffs have complained to several employees (including, on information and belief, managerial employees of Defendants) about the lack of accessible ticketing procedures, the Arena, and its facilities, on information and belief, no access improvements were made as a result of complaints made by Plaintiffs.

93.     Defendants' discriminatory practices and/or policies that limit or deny full enjoyment of its facilities to persons with physical disabilities indicate actual and implied malice and conscious disregard for the rights of Mr. Phoenix and other similarly disabled individuals. Defendants have thus engaged in willful affirmative misconduct in violating the Unruh Act.

94.     On information and belief, the access features of the Arena and its ticketing policies and procedures have not been improved since Plaintiffs' most recent visits to the Arena. Plaintiffs' injuries are ongoing and will continue so long as Defendants do not modify their policies and procedures and provide fully-accessible facilities for Plaintiffs and other persons with mobility disabilities.

95.     At all times herein mentioned, Defendants knew, or in the exercise of reasonable diligence should have known, that their barriers, policies and practices at their facilities violated disabled access requirements and standards, and had a discriminatory impact upon Plaintiffs and upon other persons with mobility disabilities and their companions, but Defendants failed to rectify the violations, and presently continue a course of conduct in maintaining policy and architectural barriers that discriminate against Plaintiffs and similarly situated disabled persons and their companions.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**FIFTH CLAIM:**
**VIOLATION OF CALIFORNIA'S DISABLED PERSONS ACT**
**[Cal. Civil Code §§ 54, *et seq.*]**
**(Against All Defendants)**

96.    Plaintiffs replead and incorporate by reference, as if fully set forth again herein, the factual allegations contained in all paragraphs of this Complaint, and incorporate them herein by reference as if separately repled hereafter.

97.    The Arena is a place of public accommodation and/or places to which the public is invited and, as such, they must comply with the provisions of the California Disabled Persons Act ("CDPA"), California Civil Code § 54 *et seq*.

97.    The CDPA guarantees, among other things, that persons with disabilities have the same right as the public to the full and free use of the streets, highways, walkways, public buildings, public facilities, and other public places. California Civil Code § 54.

98.    The CDPA also guarantees, among other things, that persons with disabilities have a right to full and equal access, as other members of the public, to accommodations, advantages, facilities, and privileges of covered entities. California Civil Code § 54.1 (a)(1).

99.    The CDPA also provides that a violation of the ADA is a *per se* violation of the CDPA. California Civil Code § 54.1 (d).

100.   Defendants have violated the CDPA by, among other things, denying and/or interfering with Plaintiffs' right to full and equal access as other members of the public to the accommodations, advantages, and its related facilities due to their disability.

## **PRAYER**

1.    Plaintiffs have no adequate remedy at law to redress the wrongs suffered as set forth in this Complaint.  Plaintiffs have suffered and will continue to suffer irreparable injury because of the unlawful acts, omissions, policies, and practices of Defendants as alleged herein, unless Plaintiffs are granted the relief they request.  Plaintiffs and

Defendants have an actual controversy and opposing legal positions as to Defendants' violations of the laws of the United States and the State of California. The need for relief is critical because the rights at issue are paramount under the laws of the United States and the State of California.

WHEREFORE, Plaintiffs pray for judgment and the following specific relief against Defendants:

2.     Issue a declaratory judgment that Defendants' actions, omissions, and failures, including but limited to: failing to construct and modify the premises in compliance with the 1991 ADA Standards for Accessible Design, 2010 ADA Standards for Accessible Design, and the applicable iterations of the CBC; failing to operate accessible ticketing procedures; and failing to make reasonable modifications in policy and practice for Plaintiffs and other persons with mobility disabilities, violate the rights of Plaintiffs and other similarly situated persons under 42 U.S.C. §§ 12101 *et seq.* and the regulations promulgated thereunder; and California Civil Code §§ 51 *et seq.*

3.     Issue an order enjoining Defendants, their agents, officials, employees, and all persons and entities acting in concert with them:

    a.  From continuing the unlawful acts, conditions, and practices described in this Complaint;

    b.  To provide reasonable modifications in policies, practices, and procedures for persons with mobility disabilities in all its programs, services and activities at the Arena;

    c.  To ensure that persons with mobility disabilities are not denied the benefits of, or participation in, programs, services, and activities at the Arena;

    d.  To modify the above-described facilities to provide full and equal access to persons with mobility disabilities, including, without limitation, the removal of all barriers that violate the 2010 ADA Standards for Accessible Design

and/or the 2010 iteration of the CBC, whichever provides greater access to persons with mobility disabilities;

   e.  To maintain such accessible facilities once they are provided;

   f.  To train Defendants' employees and agents in how to provide full and equal access to services for ticketing and equivalent accessible seating; and,

   g.  To implement nondiscrimination protocols, policies, and practices to ensure full and equal access for persons with mobility disabilities.

4.    Retain jurisdiction over Defendants until the Court is satisfied that Defendants' unlawful policies, practices, acts and omissions, and maintenance of inaccessible public facilities as complained of herein no longer occur, and cannot recur;

5.    Award statutory damages in accordance with California Civil Code §§ 52(a) and 54.3(a);

6.    Award to Plaintiffs all reasonable attorneys' fees, litigation expenses, and costs of this proceeding as provided by law, including, but not limited to, the ADA, 42 U.S.C. § 12205; the Unruh Act, Cal. Civil Code § 52; California's Disabled Persons Act, Cal. Civil Code §54; and "public interest" attorney fees pursuant to the provisions of California Code of Civil Procedure § 1021.5;

7.    Award prejudgment interest pursuant to California Civil Code § 3291; and,

8.    Grant any other relief that this Court may deem just and proper.

Dated: December 19, 2023

                        PEIFFER WOLF CARR KANE
                        CONWAY & WISE, LLP

                        */s/ Catherine Cabalo*
                        CATHERINE CABALO
                        Catherine Cabalo (SBN 248198)
                        Khushpreet Mehton (SBN 276827)
                        PEIFFER WOLF CARR KANE
                        CONWAY & WISE, LLP
                        555 Montgomery Street, Suite 820
                        San Francisco, CA 94111

Tel:    (415) 766-3592
Fax:    (415) 402-0058
Email: ccabalo@peifferwolf.com
           kmehton@peifferwolf.com

Adam B. Wolf (SBN 215914)
PEIFFER WOLF CARR KANE
CONWAY & WISE, LLP
3435 Wilshire Blvd., Ste. 1400
Los Angeles, CA 90010
Tel:    (213) 866-9662
Fax:    (415) 840-9435
Email: awolf@peifferwolf.com

Irakli Karbelashvili, Esq. (SBN 302971)
AllAccess Law Group
1400 Coleman Ave Ste F28
Santa Clara, CA 95050
Telephone: (408) 295-0137
Fax: (408) 295-0142
irakli@allaccesslawgroup.com

Attorneys for Plaintiffs and the Proposed
Plaintiff Classes

## DEMAND FOR JURY

Plaintiffs demand a jury for all claims for which a jury is permitted.

Dated: December 19, 2023

PEIFFER WOLF CARR KANE
CONWAY & WISE, LLP

*/s/ Catherine Cabalo*
CATHERINE CABALO

Attorneys for Plaintiffs and the Proposed
Plaintiff Classes